# ARMED SERVICES BOARD OF CONTRACT APPEALS

Appeal of -- )
)
Buck Town Contractors & Co. ) ASBCA No. 60939
)
Under Contract No. W912P8-09-D-0052 )

APPEARANCES FOR THE APPELLANT: W. Lee Kohler, Esq.
Douglas A. Kewley, Esq.
Thomas F. Gardner, Esq.
  Gardner & Kewley, APLC
  Metairie, LA

APPEARANCES FOR THE GOVERNMENT: Thomas J. Warren, Esq.
  Acting Engineer Chief Trial Attorney
William G. Meiners, Esq.
Stephen S. Bland, Esq.
  Engineer Trial Attorneys
  U.S. Army Engineer District, New Orleans

## OPINION BY ADMINISTRATIVE JUDGE D'ALESSANDRIS
## ON APPELLANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT

The United States Army Corps of Engineers (Corps or government) contracted with Buck Town Contractors & Co. (Buck Town) to reconstruct a hurricane protection levee in St. Charles Parish, Louisiana. Buck Town subcontracted the work in question to Circle LLC (Circle). The contract required placement of a layer of geotextile material at the base of the levee, and that the geotextile be provided in continuous machine-direction lengths without seams, with all seams and overlaps to be installed perpendicular to the centerline of the levee. For reasons of efficiency related to the length of the rolls of geotextile material used on the project, every third row of geotextile material on the levee installed by Circle consisted of two strips of material joined by an overlap running parallel to the centerline of the levee. The Corps objected to this method only after one segment of the levee was complete (and the geotextile buried) and another segment had a large part of the geotextile installed. Buck Town was required to remedy this situation by the Corps, leading to the dispute now before us.

Buck Town moves for partial summary judgment on an issue of contract interpretation, seeking a holding that the contract permitted the use of partial rows of

geotextile. We deny Buck Town's motion.[1] We find that the plain language of the contract does not permit the use of overlaps parallel to the centerline of the levee.[2]

## STATEMENT OF FACTS FOR PURPOSES OF THE MOTION

On 28 September 2009, the Corps awarded to Buck Town under Multiple Award Task Order Contract No. W912P8-09-D-0052 (the contract), Task Order No. 0004, for construction of Reach 1A, part of a hurricane protection levee in St. Charles Parish, Louisiana (R4, tab 2). Buck Town subcontracted work, including, geotextile placement, to Circle (Statement of Genuine Issues (SGI) ¶ 2). The task order for Reach 1A required a layer of geotextile material covering an area approximately 120-feet wide by 2,900-feet long (R4, tab 79 at 1890).

The contract's specification for reinforcement geotextile provided, in relevant part:

3.1.1 Procedure

> The geotextile shall be installed to the lines and grades as shown on the contract drawings. Objects, or debris that are capable of damaging the geotextile shall be removed before the geotextile is placed. At the time of installation, the geotextile shall be rejected if it has defects, rips, holes, deterioration, or damage which was incurred during manufacture, transportation, or storage. The geotextile shall be installed with the seams facing up to allow for visual inspection. All seams and overlaps shall be placed perpendicular to the centerline of the levee. Fill shall not be placed on the geotextile until the seams or overlaps are within 5 degrees of being perpendicular to the levee centerline and all sags and wrinkles are removed from the geotextile. The Contractor shall take precautions to avoid damaging the geotextile during placement.
>
> ....

---

[1] The present motion concerns only ASBCA No. 60939, which is consolidated with ASBCA Nos. 60940 and 60941. Buck Town initially filed a second motion for summary judgment in ASBCA No. 60941, regarding a dispute as to whether it was required to replace certain geotextile based upon testing of the fabric's tensile strength. Buck Town withdrew that motion on 2 October 2017.

[2] The Corps did not cross-move for summary judgment, so we deny Buck Town's motion, but do not enter summary judgment in favor of the Corps.

2

### 3.3.1 Seams

Geotextile panels shall be sewn along the selvedged edges so that seams run parallel with the machine direction to produce geotextile pieces that are wider than the weaving machine produces. Geotextiles shall be supplied in continuous machine direction lengths without seams. All seams shall be made with thread that meets the requirements for plastic yarn, as specified in paragraph GEOTEXTILE REQUIREMENTS. The Contractor is responsible for choosing the sewing machine, thread, stitch type, number of stitches per inch and any other particulars that are required to achieve the seam strength that is specified in Table 1.

### 3.3.1.1 Damaged Seams

Rips in seams that occur as a result of placement, and which are less than two feet from the end of the geotextile panel do not require repair. Rips that are longer than two feet, or of any length that occur at locations that are more than two feet from the end of the panel, shall be repaired by placing a single layer of geotextile of the same strength to cover the entire affected seam. The piece of geotextile shall extend a minimum of five feet on each side of the damaged seam.

### 3.3.2 Overlaps

Overlaps may be used at [points of intersection[3]] or to join pieces of geotextile that become too heavy to handle with construction machinery. All overlaps shall run in the same direction as the seams. A minimum of two feet is required at each overlap.

(R4, tab 5 at 110-12) In December 2009, Buck Town submitted to the Corps a geotextile fabric placement plan with a plan view showing overlapping, full length panels installed perpendicular to the centerline of the levee (R4, tab 6).

In January 2010, Circle placed the geotextile material in Reach 1A of the levee (R4, tabs 8, 9). Circle used 15' x 300' rolls of geotextile material for the project (R4, tab 11). To minimize waste from the 300' rolls of geotextile, Circle typically placed two 120',

---

[3] A point of intersection is where the centerline of the levee changes direction.

full-length panels, and one 60', partial-length panel, from each roll. In rows that used two partial-length panels, Circle joined the panels with a 2' overlap. (R4, tab 2 at 20; SGI ¶ 6) To prevent ultraviolet radiation damage, each day Circle would place the first layer of fill over the newly-placed geotextile, covering the overlaps from view (R4, tab 8).

Several representatives of the Corps, including quality assurance inspectors, were on site at various times while Circle placed the geotextile material in Reach 1A (R4, tab 8; app. supp. R4, tab 33). Buck Town's quality control reports, submitted to the Corps, included the statement that "2' overlapping was applied at every adjoining new roll of geotextile" (R4, tab 8; app. supp. R4, tabs 9, 11, 13, 21, 23, 25, 27, 29, 31, 33, 35). The Corps' quality assurance inspectors did not raise any issues with Circle's geotextile placement (R4, tab 9; app. supp. R4, tabs 10, 12, 14, 22, 24, 26, 28, 30, 32, 34, 36). During February and March, 2010, Circle continued to place embankment fill over the geotextile (compl. ¶ 121, answer ¶ 121). By 24 March 2010, Circle had placed roughly seven feet of embankment fill along the entire levee crest covering the geotextile (app. supp. R4, tab 129).

Under a different task order, Task Order No. 0005, Buck Town and Circle constructed a second reach of the same levee, referred to as Reach 2A (app. supp. R4, tab 5). On 10 March 2010, during the Reach 2A Geotextile Preparatory Phase Meeting, Buck Town and Circle discussed with Mr. Otho Barnes, P.E., a Corps engineer, that, the "material for two (2) rows will be installed in complete/whole 90' sections. Every third row/panel an overlap will be required at the parallel seam/lap." (App. supp. R4, tab 47)[4] From 16-24 March 2010, Circle placed roughly 40 percent of the geotextile on the Reach 2A project, including some geotextile rows with overlaps joining two partial-length panels (compl. ¶¶ 143, 148, answer ¶¶ 143, 148).

During a 24 March 2010 site visit, Mr. Barnes informed Circle that "reinforcement geotextile may be installed incorrectly, and that no seam splicing should occur, when being placed" (app. supp. R4, tab 58). An unsigned copy of the Corps' 24 March 2010 quality assurance report[5] states:

> Circle…had been installing the fabric where when the end of
> the, usually 300' roll of fabric came, the next roll was
> overlapped 2' with a seam running parallel to levee centerline
> and the installing of fabric continued. What should have
> occurred is that no pieces or panels of fabric should have been
> installed if they were less than 90' wide. That's the distance
> across the bottom of the degraded levee. If done in that
> manner, no parallel to centerline seams would have occurred.

---

[4] Reach 2A was 90' across whereas Reach 1A was 120'.

[5] A signed copy of the 24 March 2010 quality assurance report, apparently provided contemporaneously to Circle, does not contain the cited language (app. supp. R4, tab 57).

4

(R4, tab 11) Circle removed and replaced the geotextile that had been incorrectly placed on Reach 2A (R4, tab 2 at 5). On 25 March 2010, the Corps issued Contract Deficiency Notice No. 1 on the Reach 1A Project contending that Buck Town was in "violation of specification section 31 05 19.05 12, paragraph 3.1.1 by installing reinforcement geotextile overlaps parallel to the centerline of the levee" (R4, tab 12).

On 19 November 2010, the administrative contracting officer,Mr. Jeffrey Falati, ordered Buck Town to reconstruct the Reach 1A levee (R4, tab 33). On 28 December 2010, Buck Town submitted a Notice of Claim for Constructive Change. On 24 January 2011, Buck Town submitted a Request for Equitable Adjustment. On 7 February 2011, the contracting officer rejected Buck Town's Request for Equitable Adjustment. (R4, tab 2 at 13) Buck Town submitted a claim on 22 March 2016 that was denied by the Corps' contracting officer on 20 September 2016 (R4, tab 2 at 18, 30). This appeal followed.

## DECISION

Board Rule 7(c)(2) provides that we look to FED. R. CIV. P. 56 for guidance in deciding motions for summary judgment. We will grant summary judgment only if there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A material fact is one that may affect the outcome of the decision. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). The moving party bears the burden of establishing the absence of any genuine issue of material fact, and all significant doubt over factual issues must be resolved in favor of the party opposing summary judgment. *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1390-91 (Fed. Cir. 1987). Once the moving party has met its burden of establishing the absence of disputed material facts, then the non-moving party must set forth specific facts, not conclusory statements or bare assertions, to defeat the motion. *Pure Gold, Inc. v. Syntex (U.S.A.), Inc.*, 739 F.2d 624, 626-27 (Fed. Cir. 1984).

Buck Town asserts that the plain meaning of the contract permitted it to place the geotextile across the levee with non-full-length pieces so long as the material was properly overlapped. Buck Town's interpretation relies upon its asserted "plain meaning" of the term "placed" as "to put in a particular position." Thus, Buck Town argues that it satisfied the contractual requirement of "placing" the material perpendicular to the centerline of the levee because it unrolled the geotextile in a direction that was perpendicular to the levee. (App. br. at 11-15) The government asserts that the plain meaning of the contract prohibits the use of partial-length pieces of geotextile because it creates an overlap that is not perpendicular to the centerline of the levee (gov't br. at 4-5).

Contract interpretation is a matter of law. *See, e.g., ThinkQ, Inc.*, ASBCA No. 57732, 13 BCA ¶ 35,221 at 172,825. In interpreting a contract, we begin with the plain language of the contract. *See, e.g., Banknote Corp. of America, Inc. v. United States*, 365 F.3d 1345, 1353 (Fed. Cir. 2004). An additional canon of contract interpretation is that the

5

contract should be read as a whole, harmonizing and giving meaning to all provisions. *ThinkQ*, 13 BCA ¶ 35,221 at 172,825 (citing *NVT Technologies, Inc. v. United States*, 370 F.3d 1153, 1159 (Fed. Cir. 2004)).

Here, the geotextile specifications clearly provide that "[a]ll seams and overlaps shall be placed perpendicular to the centerline of the levee" (R4, tab 5, ¶ 3.1.1). Buck Town, in arguing the plain meaning of the provisions states that "[i]n lieu of utilizing seams to widen the material, as long as the machine-direction axis of the material was oriented perpendicular to the centerline of the levee, the Contract allowed Circle to 'join pieces of geotextile' by using 2' overlaps of adjacent panels" (app. br. at 14). As an initial point, we disagree with Buck Town's proffered interpretation of the contract as permitting overlaps parallel to the centerline of the levee so long as the geotextile was unrolled in a direction perpendicular to the centerline of the levee. Here Buck Town cites the Oxford dictionary definition of the word "placed" as "put in a particular position," supposedly supporting its interpretation of the contract that "placed" only governed the means by which it was installed (app. br. at 13). We read this definition of placed to indicate where something was put, not the direction in which it was installed. This is consistent with the full dictionary definition: "put in a particular position: *a newspaper had been placed beside my plate.*" NEW OXFORD AMERICAN DICTIONARY (3d ed. 2010). In addition, Buck Town's proffered interpretation directly conflicts with ¶ 3.3.1 "Seams" which provides that "[g]eotextiles shall be supplied in continuous machine direction lengths without seams" (R4, tab 5 at 112). Thus, we find that the plain meaning of the contract does not support Buck Town's interpretation.

Buck Town additionally argues that the Corps' interpretation of the geotextile specifications is internally inconsistent because each overlap is two-dimensional. Thus, Buck Town argues, each overlap consists of an overlap perpendicular to the direction of the levee centerline and an overlap that is parallel to the levee centerline. (App. br. at 18-21)[6] However, it is Buck Town's interpretation that creates internal inconsistency. The geotextile provisions provide that "Geotextile panels shall be sewn along the selvedged[7] edges so that seams run parallel with the machine direction to produce geotextile pieces that are wider than the weaving machine produces. Geotextiles shall be supplied in continuous machine direction lengths without seams." (R4, tab 5 at 112) Overlaps can be substituted for seams to join pieces of geotextile that become too heavy to handle with construction equipment, and must run in the same direction as seams (*id.*). Thus, the "seam" that can be replaced with an overlap is the long seam running in the machine direction, not the cut edge across the machine width.

---

[6] This interpretation would make the requirement for perpendicular overlapping to be meaningless because all such two-dimensional overlaps would contain a perpendicular component.

[7] Selvedge is defined as "an edge produced on woven fabric during manufacture that prevents it from unraveling." NEW OXFORD AMERICAN DICTIONARY (3d ed. 2010).

6

Buck Town's proffered interpretation is internally inconsistent with the contract provisions providing that all seams must be perpendicular to the centerline of the levee and that the geotextiles be supplied in "continuous machine direction lengths without seams" (R4, tab 5 at 112). Buck Town attempts to avoid the contract language requiring that seams be perpendicular to the centerline by arguing that the language applies to seams that make the geotextile wider and not other seams (app. reply at 22). Even assuming that Buck Town's interpretation is correct, its proposed interpretation still conflicts with the provision requiring that the geotextile be supplied in continuous machine direction lengths without seams. Buck Town additionally argues that the material was "supplied" in continuous lengths because it was delivered from the manufacturer to the job site in continuous machine direction without seams (*id.* at 22-23). The term "supply" means to "make (something needed or wanted) available to someone; provide." NEW OXFORD AMERICAN DICTIONARY (3d ed. 2010). Here, the geotextile specifications concern the relationship between the Corps and Buck Town. Thus, the Corps is the "someone" in the dictionary definition that has received the goods. Buck Town did not "supply" continuous rows of geotextile without seams to the Corps.

Buck Town also argues that the Corps' interpretation requires the Board to read into the contract language that does not exist. Buck Town asserts that the geotextile specifications and contract drawings do not contain any expressed instructions requiring geotextile rows "having a continuous, machine-direction length sufficient to span the entire distance from the flood side placement limit to the protected side limit," "[p]rohibiting the contractor from joining together two less-than-full-length panels of geotextile," or prohibiting overlaps parallel to the centerline (app. br. at 22-23). Contrary to Buck Town's argument, the geotextile specifications specifically require that "[g]eotextiles shall be supplied in continuous machine direction lengths without seams" (R4, tab 5 at 112). Moreover, the specification's requirement that "[a]ll seams and overlaps shall be placed perpendicular to the centerline of the levee" necessarily prohibits seams and overlaps placed parallel to the centerline of the levee. The fact that the Corps could have included more explicit language that might have prevented this dispute is of no moment. Further, Buck Town's citation to *A.A. Conte & Son, Inc.,* ENG BCA Nos. 6104, 6227, 96-2 BCA ¶ 28,581, is not persuasive because that appeal involved a contract where the Army Corps of Engineers Board of Contract Appeals agreed with the appellant's interpretation of the plain language of the contract. Here, we find that the contractual language does not support the appellant's interpretation.

Having found that the plain meaning of the contract is not consistent with Buck Town's proposed interpretation, we decline to consider Buck Town's extrinsic evidence regarding the parties' pre-dispute conduct (app. br. at 25-30). *See, e.g., City of Tacoma, Dept. of Public Utilities v. United States,* 31 F.3d 1130, 1134 (Fed. Cir. 1994); *Banknote Corp.,* 365 F.3d at 1353. To the extent such a claim is properly before the Board, Buck Town may choose to present evidence of pre-dispute conduct at a hearing in support of the waiver argument it belatedly raises in its reply brief (app. reply at 38-47). Arguments raised for the first time in a reply brief are waived. *Raytheon Company, Space & Airborne*

7

*Systems*, ASBCA No. 57801 *et al.,* 15-1 BCA ¶ 36,024 at 175,960 n.3; *see also Systems Management and Research Technologies Corp. v. Dept. of Energy*, CBCA No. 4068, 16-1 BCA ¶ 36,333 at 177,138 n.7 (citing *Bannum, Inc. v. United States*, 121 Fed. Cl. 543, 552 n.6 (2015)). For the same reason, we do not consider Buck Town's argument that the "real issue" is the Corps' undisclosed engineering considerations (app. reply at 1-10). Additionally, as we do not find the contract to be ambiguous, Buck Town's latent ambiguity argument is inapplicable. *City of Tacoma*, 31 F.3d at 1134.

CONCLUSION

For the reasons stated above, Buck Town's motion for partial summary judgment is denied.

Dated: 11 January 2018

DAVID D'ALESSANDRIS
Administrative Judge
Armed Services Board
of Contract Appeals

I concur

RICHARD SHACKLEFORD
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I concur

J. REID PROUTY
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 60939, Appeal of Buck Town Contractors & Co., rendered in conformance with the Board's Charter.

Dated:

JEFFREY D. GARDIN
Recorder, Armed Services
Board of Contract Appeals

8